# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

LORI KING,

                                        *Plaintiff,*

                    v.

CAPITAL ONE BANK (USA), N.A. AND
INCHARGE DEBT SOLUTIONS,

                                        *Defendants.*

CASE NO. 3:11-cv-00068

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

Plaintiff Lori King ("Plaintiff") brings this putative class action against Defendants InCharge Debt Solutions ("InCharge") and Capital One Bank (USA), N.A. ("Capital One"), alleging that both defendants violated section 1679b(a)(4) of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq.* Plaintiff alleges that InCharge, which promotes itself as a non-profit, tax-exempt credit counseling agency whose main purpose is to act on behalf of consumers and their interests, in fact operates as a partner, joint venturer, and/or agent of the very creditors that the consumers were trying to get out from under, including Capital One. Plaintiff also brings numerous other claims solely against InCharge under the CROA and the Fair Debt Collection Practices Act ("FDCPA"), as well as state law claims under Georgia Code § 18-5-3.2[1] and Florida Code § 817.801.[2] The matter is before the Court on InCharge's motion to dismiss and compel arbitration or in the alternative to strike Plaintiff's class allegations (docket no. 18) and Capital One's motion to dismiss and stay (docket no. 23).

---

[1] Under the Georgia Debt Adjusting Act, any person engaged in the business of "debt adjusting" must disburse to the appropriate creditors all funds received from a debtor within 30 days of their receipt.

[2] Under Florida law, any person engaged in debt management or credit counseling services must disburse to the appropriate creditors all funds received from a debtor (less any permitted fees) within 30 days of their receipt.

A bench trial on the threshold factual issue of whether Plaintiff signed an agreement obliging her to arbitrate her disputes is scheduled to begin on December 18, 2012. At a hearing on September 24, 2012, I asked counsel to identify any legal issues that could be resolved prior to that trial. After considering counsel's oral arguments and briefs, for the reasons that follow I will grant InCharge's motion to strike Plaintiff's class allegations, but I will defer consideration of Defendants' motions to dismiss and compel arbitration until after the bench trial.

## I. BACKGROUND

### A. InCharge's Credit Counseling Activities

Credit counseling agencies ("CCAs") are organizations that pledge to help debt-troubled individuals avoid personal bankruptcy by developing manageable strategies for coping with large amounts of debt. The chief tool placed at the disposal of CCAs by banks and credit card companies is the debt management plan ("DMP"). Generally, after a debt-troubled consumer contacts a CCA and is directed towards proceeding with a DMP, the CCA contacts the consumer's creditors and submits a DMP proposal based on criteria previously provided by the creditors. Upon acceptance by all or some of the consumer's creditors, the consumer typically makes a single monthly payment directly to the CCA. The CCA then deposits the consumer's monthly payment into a trust account from which it forwards monthly payments to each of the consumer's creditors in an amount determined by the DMP (as dictated by the creditors).

The principal service that InCharge offered consumers was the formation and maintenance of a DMP. InCharge told consumers that when developing DMPs, it would negotiate on their behalf with their banks and credit card lenders with the ostensible benefits being the potential elimination of late and over-the-limit fees and the re-aging of credit accounts. InCharge offered these services for the express purpose of improving consumers' credit records,

histories, and/or ratings.  Plaintiff maintains that by providing such services, InCharge brought itself within the coverage of the CROA.[3]  Additionally, Plaintiff claims that InCharge used its ostensible non-profit, tax-exempt status in its advertising materials, telling consumers that it needed their voluntary "contributions" (i.e. fees), which InCharge expressly (though falsely) asserted would merely cover the cost of establishing the consumers' DMPs.

## B.  InCharge's Relationship with Capital One

Plaintiff alleges that at all pertinent times, Capital One knew about InCharge's false representations.  More specifically, Plaintiff alleges that Capital One knew that there were no "negotiations" being conducted between it and InCharge and that the "benefits" being offered by InCharge were actually pre-set by Capital One and dictated to InCharge in the form of periodic benefits sheets that Capital One unilaterally changed from time to time.  Further, Capital One knew from its reviews and audits of InCharge's policies that InCharge was not operating in a manner consistent with its non-profit status.  Significantly, Plaintiff also alleges that the reduction of interest rates, the re-aging of accounts, and the waiver of fees were all "benefits" that were exclusively under the control of Capital One.  Thus, according to Plaintiff, Capital One entirely controlled the product that InCharge was effectively selling to consumers.  Moreover, Capital One exercised control over InCharge's policies by conditioning its tens of millions of dollars of support on InCharge's compliance with Capital One's directives.

---

[3] InCharge argues that as an organization that maintains tax-exempt status under § 501(c)(3) of the Internal Revenue Code, it is not subject to many of the CROA provisions referenced in the Complaint.  The CROA's definitions section does in fact specifically exclude "any nonprofit organization which is exempt from taxation under section 501(c)(3)" from the definition of the term "credit repair organization."  15 U.S.C. § 1679a(3)(B)(i).  However, the mere fact that a CCA has obtained 501(c)(3) status does not insulate it from CROA coverage.  *See Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, 478 (1st Cir. 2005) ("[T]o be excluded from the CROA under 15 U.S.C. § 1679a(3)(B)(i), a credit repair organization must actually operate as a nonprofit organization and be exempt from taxation under section 501(c)(3)"); *Polacsek v. Debticated Consumer Counseling, Inc.*, 413 F. Supp. 2d 539, 550 (D. Md. 2005) ("501(c)(3) status of the CCAs is not ipso facto dispositive of whether a CCA is exempt from CROA. The Court is obliged to consider whether in operation they truly functioned as such.").  Plaintiff has alleged sufficient facts that, taken as true, suggest that InCharge is not truly operating as a non-profit and therefore falls within the CROA's coverage.

3

According to Plaintiff, the benefits to Capital One from having InCharge perform this role included, among other things: (1) improved collection rates from having a friendly "non-profit" induce consumers into continuing to make payments; (2) lessening of Capital One's collection costs by inducing consumers to pay "voluntary contributions" to support the "non-profit" InCharge; (3) the ability to claim Community Reinvestment Act credits for its "donations" to InCharge (which were actually booked as ordinary fee-for-service business expenses and treated that way on Capital One's tax returns); and (4) immunization of Capital One from existing regulations such as the CROA and the FDCPA by having a layer of protection between it and consumers.

In the end, Plaintiff alleges that InCharge is nothing more than a debt collector that has partnered with Capital One to collect its accounts under the guise of a non-profit good Samaritan rescuing consumers from their debt.  Instead of operating a non-profit entity, Plaintiff alleges, InCharge distributed the monthly payments it collected from consumers to Capital One while also keeping a share for itself.  The share kept by InCharge effectively functioned as a quid pro quo payment from Capital One.  Such payment, known in industry parlance as "fair share," was hidden from consumers, who were informed only that their creditors might make charitable "contributions" to InCharge.  According to Plaintiff, creditors like Capital One are willing to share debt collection proceeds in the form of "fair share" because the amount they end up remitting is much less than the 25%-33% that is standard payment to ordinary collection agencies.  Plaintiff alleges that Capital One paid InCharge tens of millions of dollars in "fair share."  In addition, Plaintiff maintains that the "voluntary contributions" that InCharge requested from consumers far exceeded the costs of the services it rendered and that, contrary to its non-profit status, InCharge kept these fees rather than returning the money or lowering DMP

4

prices.  Ultimately, Plaintiff alleges that InCharge deceived and cheated consumers, and that Capital One was a direct or at least an indirect cause of (as well as one of the biggest beneficiaries of) the fraud.

### C.  The Representative Plaintiff

Plaintiff Lori King, a Georgia resident, contacted InCharge by phone in the fall of 2007. She established with InCharge a DMP that included two Capital One credit card accounts. InCharge collected what was denominated a "contribution," but which was in fact a setup fee in the amount of $49, the maximum setup fee permitted by Georgia law.  Thereafter, InCharge collected a $49 monthly fee from Plaintiff.  Both fees were assessed and received by InCharge before performing any services for Plaintiff, allegedly in violation of the CROA.

Plaintiff continued to pay InCharge for its DMP service at least through the filing of this action, and Capital One received monthly payments from Plaintiff until 2011.  Plaintiff alleges that she received no counseling from InCharge.  She states further that InCharge represented to her that her DMP would be paid in full in 2 ½ years; however, after making payments to InCharge for 3 ½ years, Plaintiff still owed money to her creditors.  Plaintiff alleges that InCharge violated the CROA by failing to provide Plaintiff or any of its other clients with DMP contracts, mandatory pre-contract disclosures, or a "cooling off period."

Finally, Plaintiff argues that Defendants should be equitably estopped from relying upon the statute of limitations or, alternatively, that the doctrine of equitable tolling should apply to bar Defendants from relying on any statute of limitations.  According to Plaintiff, neither she nor any members of the classes described below had any way of knowing that InCharge was really a commercial enterprise, an agent of Capital One, or the recipient of tens of millions of dollars in financial support from Capital One on a quid pro quo basis.  Similarly, Plaintiff contends that she

and others similarly situated had no way of knowing that InCharge was not actually negotiating with creditors like Capital One, and that InCharge and Capital One acted as if they were partners.

### D.  Class Allegations

Plaintiff alleges that InCharge has had hundreds of thousands of DMP clients, of which a substantial subset had Capital One accounts.  Correspondingly, she outlines two distinct but overlapping classes and one-sub-class:

- Class 1 (the "Capital One Class") consists of all consumers who were indebted to Capital One and who contracted for DMP services from InCharge; and

- Class 2 (the "InCharge Class") consists of all consumers who entered into a DMP with InCharge.

  - Subclass 1 consists of all Georgia residents from whom InCharge accepted charges, fees, contributions, or a combination thereof and for whom InCharge failed to disburse to creditors all payments within thirty days of receipt of such funds.

Plaintiff estimates that there are over 200,000 members of the InCharge Class and at least 30,000 members of the Capital One Class.  Thus, joining the individual members of the putative class, Plaintiff contends, would be impracticable.

Additionally, Plaintiff submits that issues of law and fact that are common to the members of the classes predominate over the questions affecting the individual members of the classes, including Plaintiff.  Plaintiff also asserts that her claims are typical of the claims of the class members.  Plaintiff concedes that the specific amounts of the fees paid by each of InCharge's customers may differ depending on the amount of an individual customer's overall debt, the number of months the customer was on her DMP, and the number of accounts that the

customer entrusted to InCharge for servicing.  Plaintiff nonetheless suggests that the damages

suffered by each of the members of the classes will be calculable under a single formula—the

total amount of fees the customer paid to InCharge.  Individual claims in this case would

probably be insufficient in amount to support individual actions; therefore, Plaintiff submits that

class certification would allow actual litigation of the claims.  In addition, individual class

members are unlikely to be aware of their rights and are thus not in a position to commence

individual litigation against Defendants.  Finally, Plaintiff represents that she is not burdened by

conflicts with any members of the classes that would prohibit her from serving as the class

representative, and Plaintiff states that she is represented by able counsel who will faithfully

represent the proposed classes.  In sum, Plaintiff maintains that a class action is the superior

mechanism by which to pursue this case.

## II. STANDARD OF REVIEW

A motion to dismiss for lack of subject matter jurisdiction is governed by Federal Rule of

Civil Procedure 12(b)(1).  As a general matter, the plaintiff has the burden of demonstrating that

subject matter jurisdiction properly lies in federal court.  *See Evans v. B.F. Perkins Co., a*

*Division of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999).  "When a defendant

challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the

pleadings as mere evidence on the issue, and may consider evidence outside the pleadings

without converting the proceeding into one for summary judgment.'"  *Id.* (quoting *Richmond,*

*Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).  "[I]f

the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a

matter of law," the Rule 12(b)(1) motion should be granted.  *Richmond*, 945 F.2d at 768.  Thus,

even though the motion is not converted into one for summary judgment, it is effectively the

summary judgment standard that applies.  Accordingly, reasonable inferences should be drawn in the light most favorable to the nonmoving party.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## III. DISCUSSION

Defendant InCharge has moved to dismiss all claims by Plaintiff and compel individual arbitration pursuant to an arbitration clause contained in the "Terms of Debt Management" page of a "Client Agreement" that outlined the terms and conditions of the DMP agreed upon by Plaintiff and InCharge.  Plaintiff flatly denies that she ever signed any agreement containing the arbitration clause, either by hand or electronically.  She contends that she entered into her DMP and provided her debt and bank account information entirely over the phone.  Because there is a genuine dispute of material fact as to whether Plaintiff signed any agreement containing an arbitration clause, I have ordered a bench trial to determine whether the evidence shows that Plaintiff did in fact enter into an agreement to arbitrate disputes relating to her DMP with InCharge.  As such, any ruling on defendants' motions to dismiss and compel arbitration must be deferred until after trial on the threshold issue.

In considering InCharge's motion in the alternative to strike the class allegations from the Complaint, however, I find that regardless of whether Plaintiff entered into an agreement to arbitrate with InCharge, she cannot state a claim for class action relief.  On the one hand, if she did enter into the Client Agreement, I find that the arbitration clause it contains is valid and enforceable, and its express terms prohibit Plaintiff from pursuing her claims in a class action lawsuit.  On the other hand, if she did not enter into the Client Agreement, I find that Plaintiff cannot satisfy the requirements for bringing a class action set forth in Federal Rule of Civil Procedure 23.  I will analyze each of these possibilities in turn.

## A.  The Client Agreement

For the purposes of this discussion, I assume that defendants can prove at trial that Plaintiff signed either by hand or electronically the "Client Agreement" outlining the terms of Plaintiff's individual DMP.  The Client Agreement incorporates by reference a page entitled "Terms of Debt Management," which includes the following provision:

> CONSTRUCTION; APPLICABLE LAW; ARBITRATION; HOLD HARMLESS: This Agreement and all attached documents, forms, and schedules contain the complete agreement between you and InCharge Debt Solutions regarding the DMP.  All questions concerning the agreement between you and InCharge will be governed by the laws of the State of Florida without reference to any conflict of law rules.  Any provision of this Agreement (the specific sentence, section, or part thereof only) is not effective where prohibited by applicable law.  Any dispute between us that cannot be amicably resolved, and all claims or controversies arising out of this Agreement, shall be settled solely and exclusively by binding arbitration in the City of Orlando, Florida administered by the American Arbitration Association under the then prevailing Commercial Arbitration Rules (it being expressly acknowledged that you will not participate in any class action lawsuit in connection with any such dispute, claim, or controversy, either as a representative plaintiff or as a member of a putative class), and judgment upon the award rendered by the arbitrator(s) may be entered in any court of competent jurisdiction.

If defendants can prove that Plaintiff entered into the Client Agreement containing this arbitration clause, the next step is to determine whether such clause is valid and enforceable. *See Glass v. Kidder Peabody & Co.*, 114 F.3d 446, 453 (4th Cir. 1997) (noting that courts considering motions to compel arbitration must undertake "a limited review to ensure that the dispute is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." (quoting *PaineWebber, Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir.1990)).

### 1.  Validity of the Agreement

As a general matter, there can be no doubt that federal law, in the form of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, highly favors the arbitrability of disputes and the

enforcement of arbitration agreements.  *See, e.g.*, 9 U.S.C. § 2 (making arbitration agreements

"valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract"); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S.

614, 631 (1985) (observing that the FAA reflects an "emphatic federal policy in favor of arbitral

dispute resolution"); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (stating that

the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates

that district courts shall direct the parties to proceed to arbitration on issues as to which an

arbitration agreement has been signed"); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,

460 U.S. 1, 24–25 (1983) (noting that "questions of arbitrability [must] . . . be addressed with a

healthy regard for the federal policy favoring arbitration" and "any doubts concerning the scope

of arbitrable issues should be resolved in favor of arbitration").  Moreover, the Supreme Court

has emphasized that arbitration is favored in consumer disputes:

> We agree that Congress, when enacting [the FAA], had the needs of consumers,
> as well as others, in mind. . . . [T]he Act, by avoiding the delay and expense of
> litigation, will appeal to big business and little business alike, . . . corporate
> interests [and] . . . individuals.  Indeed, arbitration's advantages often would seem
> helpful to individuals, say, complaining about a product, who need a less
> expensive alternative to litigation.

*Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 280 (1995) (internal

quotations marks and citation omitted).

Notwithstanding the presumption favoring the validity of arbitration agreements, such

agreements may nevertheless be unenforceable.  Section 2 of the FAA contains a savings clause

that allows arbitration agreements to be invalidated "upon such grounds as exist at law or in

equity for the revocation of any contract."  9 U.S.C. § 2; *see also AT&T Mobility, LLC v.

Concepcion*, 131 S. Ct. 1740, 1746 (2011) ("This saving clause permits agreements to arbitrate

to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or

unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.") (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)); *Murray v. United Food and Commercial Workers Intern. Union*, 289 F.3d 297, 302 (4th Cir. 2002). Unless the party resisting arbitration can prove such a generally applicable contract defense would invalidate the agreement, the agreement must be enforced according to its terms. *See Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 478 (1989). Given that the express terms of the arbitration clause state that "[a]ll questions concerning the agreement between you and InCharge will be governed by the laws of the State of Florida without reference to any conflict of law rules," Florida law applies when determining whether any generally applicable contract defenses would prevent enforcement of the clause.

In her complaint, Plaintiff made no reference to any arbitration agreement whatsoever, let alone any allegations that the provision at issue is unenforceable. In their motions to dismiss and compel arbitration, InCharge and Capital One preemptively offered reasons why this Court should find that the arbitration provision is not unconscionable, clearly expecting Plaintiff to make such an argument in her response brief. Plaintiff made no such argument, asserting only that the question of unconscionability of the provision is not ripe for decision since she disputes ever seeing the agreement in question, let alone agreeing to be bound by it.

To the extent that Plaintiff could have asserted other possible state law contract defenses to the arbitration agreement such as fraud or duress, I find that she has waived any such defenses as she did not raise them either in her complaint or in her response briefs. With respect to the issue of unconscionability, I find that even if Plaintiff has not waived such a defense to the arbitration agreement, the arbitration agreement in this case is not unconscionable and is

therefore valid and enforceable.  This conclusion is based on a straightforward application of the Supreme Court's recent decision in *AT&T Mobility v. Concepcion*, 131 S. Ct. 1740 (2011), and two Eleventh Circuit cases applying *Concepcion* to arbitration clauses that, like the one in this case, selected Florida law as the applicable law.

In *Concepcion*, 131 S. Ct. at 1753, the Supreme Court decided that the FAA pre-empted a California rule, set forth in *Discover Bank v. Superior Court*, 36 Cal. 4th 148, 30 Cal. Rptr. 3d 76, 113 P.3d 1100 (2005), that class action waivers in arbitration agreements contained in certain types of consumer contracts of adhesion were unconscionable and unenforceable.  Under the *Discover Bank* rule, California courts frequently found arbitration agreements containing class action waivers unconscionable.  *See Concepcion*, 131 S. Ct. at 1746.  According to the Supreme Court, the California rule amounted to requiring the availability of classwide arbitration, which "interfere[d] with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA."  *Id.* at 1748.

Less than three months after the Supreme Court decided *Concepcion*, in *Cruz v. Cingular Wireless*, 648 F.3d 1205 (11th Cir. 2011), the U.S. Court of Appeals for the Eleventh Circuit considered the validity under Florida law of a class action waiver contained in an arbitration agreement.  The agreement at issue in *Cruz* provided that customers of a cell phone service provider had to submit any disputes with the provider to arbitration on an individual basis only.  *See* 648 F.3d at 1207.  Thus, the terms of the agreement forbade class action lawsuits and class action arbitrations.  S*ee id.*  The plaintiff argued that the waiver was unenforceable because it defeated the remedial purpose of a Florida law prohibiting deceptive and unfair trade practices.  *Id.* at 1212.  The issue the Eleventh Circuit decided was "whether the arbitration agreement's

class action waiver [was] unenforceable as a violation of Florida public policy." *Id.* at 1210.

The court held that:

> in light of *Concepcion*, the class action waiver in the Plaintiffs' arbitration agreements is enforceable under the FAA. Insofar as Florida law would invalidate these agreements as contrary to public policy (a question we need not decide), such a state law would stand as an obstacle to the accomplishment and execution of the FAA.

*Id.* at 1207 (internal citation and quotation marks omitted).

While the plaintiffs in *Cruz* framed their objections to the class action waiver in the arbitration clause as violations of Florida's public policy, in *Pendergast v. Sprint Nextel Corp.*, 691 F.3d 1224, 1225 (11th Cir. 2012), the Eleventh Circuit addressed a case where the plaintiff explicitly argued that a class action waiver in an arbitration agreement was unconscionable under Florida law and therefore unenforceable. Prior to the Supreme Court's decision in *Concepcion*, the Eleventh Circuit had certified to the Florida Supreme Court four questions of Florida law, including whether the particular class action waiver at issue in *Pendergast* was procedurally or substantively unconscionable under Florida law and whether it was void under Florida law for any other reason. *See* 691 F.3d at 1230. After the U.S. Supreme Court decided *Concepcion*, the defendant in *Pendergast* moved to withdraw certification of the state law questions to the Florida Supreme Court. The Eleventh Circuit denied the defendant's request, but concluded that it would not have certified the questions had *Concepcion* been decided before the certification. *See id.* The Florida Supreme Court then declined jurisdiction and returned the case to the Eleventh Circuit. *See Pendergast v. Sprint Nextel Corp.*, No. SC10–19, 2012 WL 2948594 (Fla. July 17, 2012). The Eleventh Circuit proceeded to consider the state law issues in light of *Concepcion* and its own earlier decision in *Cruz*.

In essence, the plaintiff in *Pendergast* argued that the arbitration agreement at issue was unconscionable because it disallowed classwide procedures. *See* 691 F.3d at 1234. Terming its analysis "a straightforward application of *Concepcion* and *Cruz*," the court in *Pendergast* concluded that it "need not decide whether the class action waiver [at issue] is unconscionable under Florida law . . . because to the extent Florida law would invalidate the class action waiver, it would still be preempted by the FAA." *Id.* In other words, even if Florida state law held that an arbitration agreement that prohibited class action lawsuits was unconscionable (which both the Florida Supreme Court and the Eleventh Circuit declined to decide), such law would be inconsistent with the FAA and would necessarily be preempted under *Concepcion*.

Applying *Concepcion*, *Cruz*, and *Pendergast* to this case, I find there is no basis upon which to find the arbitration clause and class action waiver unconscionable. To the extent that the class action waiver in this case appears in a contract of adhesion, may make it more difficult to pursue small claims, and eliminates the availability of class action suits, the analysis is the same as in *Concepcion*, *Cruz*, and *Pendergast*. Just as in *Pendergast*, if Florida law were to find the arbitration clause contained in the Client Agreement unconscionable for any of those reasons, it would be preempted by federal law as set forth in the FAA and *Concepcion*. As a result, the arbitration clause containing the class action waiver is valid and enforceable.

The clause in this case states that the parties "expressly acknowledge[ ] that [Plaintiff] will not participate in any class action lawsuit in connection with any such dispute, claim, or controversy, either as a representative plaintiff or as a member of a putative class." While the parties dispute whether the class action waiver means that Plaintiff cannot proceed in arbitration on a class basis, I need not and do not address that issue here since I am only considering InCharge's motion to strike the class allegations. The explicit language of the clause states that

the Plaintiff will not participate in "any class action lawsuit," a term that undoubtedly

encompasses a class action lawsuit brought in federal district court.  As a result, if the facts show

that Plaintiff did in fact sign the Client Agreement, then by its terms she cannot bring a class

action in this Court.

## 2.  The Scope of the Agreement

The next question to consider is whether "the specific dispute falls within the substantive

scope of [the arbitration] agreement," *Glass*, 114 F.3d at 453, and thus whether the class action

waiver applies to all of Plaintiff's claims.  Plaintiff argues that some of her claims arose prior to

the existence of the Client Agreement and therefore are not covered by the arbitration clause

containing the class action waiver.  Specifically, Plaintiff alleges that InCharge failed to give the

pre-contract disclosures and notice of rights required by the CROA,[4] and that InCharge violated

the FDCPA by failing to disclose in its initial oral communication with Plaintiff that it was a debt

collector attempting to collect a debt and that any information obtained would be used for that

purpose.  *See* 15 U.S.C. § 1692e(11).  According to Plaintiff, claims based on these failures

"vested" prior to entry into the Client Agreement and are not covered by the terms of the

arbitration clause.

The language of the arbitration clause containing the class action waiver is very broad,

covering "*[a]ny dispute* between us that cannot be amicably resolved, and all claims or

controversies arising out of this Agreement." (Emphasis added).  Plaintiff's argument ignores the

words "any dispute."  Her claims clearly constitute a dispute that is covered by the plain meaning

of the contract language.  *See Jones v. Genus Credit Management Corp.*, 353 F. Supp. 2d 598,

---

[4] "CROA requires credit repair organizations to provide customers with a written disclosure statement describing the customer's rights before entering into a contract for the provision of credit repair services." *Kindred v. McLeod*, 2010 WL 4814360, at *5 (W.D. Va. Nov. 19, 2010) (citing 15 U.S.C. § 1679c(a)).

602 (D. Md. 2005) (rejecting the same argument made by Plaintiff and holding that language identical to the language in this case "self-evidently is broad enough to cover the claims asserted by plaintiffs"); *Gay*, 511 F.3d at 376 (summarily rejecting a similar argument).  Accordingly, all of Plaintiff's claims are covered by the class action waiver.

### 3.  Waivability of Class Actions Under CROA

Even though the express terms of the arbitration clause forbid her from participating "in any class action lawsuit," Plaintiff nevertheless argues that she must be allowed to proceed on a class basis because the availability of a class action is a "protection" that cannot be waived under the CROA.  Plaintiff bases this argument in the CROA's broad non-waiver provision, set forth in 15 U.S.C. § 1679f(a), which provides that "[a]ny waiver by any consumer of any protection provided by or any right of the consumer under this subchapter—(1) shall be treated as void; and (2) may not be enforced by any Federal or State court or any other person."  The CROA not only prohibits waiver of the rights and protections it provides to consumers, it also makes "[a]ny attempt by any person to obtain a waiver from any consumer of any protection provided by or any right of the consumer under this subchapter" a separate violation.  15 U.S.C. § 1679f(b).

The logic of Plaintiff's argument is simple.  First, Plaintiff notes that the CROA provides for awards of punitive damages in class actions, *see* 15 U.S.C. § 1679g(a)(2)(B), has its own punitive damages provision applicable to the "named plaintiff," 15 U.S.C. § 1679g(a)(2)(B)(i), and lists specific separate criteria for the establishment of punitive damages in class actions.  *See* 15 U.S.C. § 1679g(b)(4).  Thus, Plaintiff argues, the availability of a class action is a "protection" provided by the CROA.  Accordingly, since the CROA's non-waiver provision says that "any waiver" of "any protection provided by" the Act is void, Plaintiff argues that under the

express terms of § 1679f(a), she cannot have lawfully waived her ability to bring a class action alleging violations of the Act.

Although Plaintiff's argument may make sense in the abstract, her conclusion cannot survive in the face of the Supreme Court's decision in *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665 (2012). The issue in *CompuCredit* was "whether the CROA precludes enforcement of an arbitration agreement in a lawsuit alleging violations of that Act." *Id.* at 668. In general, the FAA permits arbitration of federal statutory claims "unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *CompuCredit*, 132 S. Ct. at 669 (quoting *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)). Despite a binding arbitration provision in the agreements they had signed, the plaintiffs in *CompuCredit* brought a class-action lawsuit against credit repair organizations, alleging violations of the CROA. *See id.* Under the CROA, credit repair organizations are required to tell consumers that they "have a right to sue a credit repair organization that violates the [CROA]." 15 U.S.C. § 1679c(a). The plaintiffs in *CompuCredit* argued that the "right to sue" meant the right to bring an action in a court of law, and because the CROA's non-waiver provision prohibits the waiver of any "right," a provision mandating arbitration could not be enforced. *See* 132 S. Ct. at 669.

The Supreme Court rejected plaintiffs' argument. *Id.* at 669–70. First, the "right to sue" language came from the CROA's disclosure provision, which required credit repair organizations to provide a notice to consumers that contained the "right to sue" language. *Id.* at 670. The actual right to sue was provided elsewhere in the CROA, namely in § 1679g, which provides for civil liability for violations of the Act. *See id.* The Court concluded that nothing in § 1679g amounted to a congressional command that the FAA should not apply. *Id.* at 671. Further, the "right to sue" language is simply "a colloquial method of communicating to consumers that they

17

have the legal right, enforceable in court, to recover damages from credit repair organizations that violate the CROA." *Id.* at 672. Ultimately, nothing in § 1679g required the availability of a suit in a court of law in the first instance as long as consumers were still able to vindicate their rights under the statute. *Id.* at 671–72.

Admittedly, *CompuCredit* is not directly on point; it addressed whether arbitration of CROA claims can be compelled, not whether class-based prosecution of such claims can be waived. However, the reasoning in *CompuCredit* applies equally to Plaintiff's theory in this case. In *CompuCredit*, the plaintiffs argued that the CROA's repeated use of terms "action," "class action," and "court" call to mind a judicial proceeding and thus create a "right" to bring an action in court. *Id.* at 670. The Court stated that "if a cause-of-action provision mentioning judicial enforcement does not create a right to initial judicial enforcement, the waiver of initial judicial enforcement is not the waiver of a 'right of the consumer.'" *Id.* at 671. As the Court pointed out:

> if one believes that § 1679g's contemplation of court suit (combined with § 1679f(a)) establishes a nonwaivable right to initial judicial enforcement, one must also believe that it establishes a nonwaivable right to initial judicial enforcement in *any* competent judicial tribunal, since it contains no limitation. We think it clear, however, that this mere "contemplation" of suit in any competent court does not *guarantee* suit in all competent courts, disabling the parties from adopting a reasonable forum-selection clause. And just as the contemplated availability of all judicial forums may be reduced to a single forum by contractual specification, so also can the contemplated availability of judicial action be limited to judicial action compelling or reviewing initial arbitral adjudication. The parties remain free to specify such matters, so long as the *guarantee* of § 1679g— *the guarantee of the legal power to impose liability*—is preserved.

*Id.* In other words, the mere fact that the statute mentions a particular concept or procedure does not mean that such concept or procedure is a "right" or "protection" that cannot be waived. Nowhere in the CROA does Congress state that consumers have the right to bring actions on a class basis. Instead, the CROA merely alludes, in a few instances, to the possibility of pursuing

18

class-based CROA claims and provides guidance on how to address such cases.  Following the

reasoning of *CompuCredit*, just as parties can agree to arbitrate CROA-based claims, so too can

they agree to litigate such claims on an individual basis, rather than on a class basis, so long as

the guarantee of the legal power to impose liability is preserved.  And that guarantee is preserved

in this case: Plaintiff will either be able to pursue her claim in this Court on an individual basis,

or she will be able to pursue it in arbitration, a result explicitly sanctioned by the Supreme Court

in *CompuCredit*.

 Finally, Plaintiff cites no authority to support her reasoning that the right to bring a class

action is a protection that cannot be waived under the CROA.  There is, however, authority

supporting the opposite conclusion.  *See, e.g.*, *Gay v. CreditInform*, 511 F.3d 369, 385 (3d Cir.

2007) (construing the CROA's anti-waiver provision "as only extending to rights premised on

the imposition of statutory duties, absent contrary language in the statute."); *Arnold v. Goldstar*

*Fin. Sys., Inc.*, No. 01 C 7694, 2002 WL 1941546, at *9 (N.D. Ill. Aug. 22, 2002) ("As a general

matter, the right to bring a class action in federal court is a procedural right created by Rule 23 of

the Federal Rules of Civil Procedure.  The only references to class actions in the CROA concern

the calculation of punitive damages.  These provisions do not create a substantive right to bring a

class action, so agreeing in an arbitration clause to forego the class action mechanism does not

amount to a waiver of a protection provided by or statutory right under the CROA.") (citations

omitted).  I therefore conclude that the CROA does not provide a nonwaivable right to bring a

class action.  As a result, if Plaintiff did sign the Client Agreement, the terms of the arbitration

clause containing the class action waiver prevent her from proceeding in this Court on a class

basis, and I must strike her class allegations.

#### 4. Applicability of the Agreement to Capital One

Although any decision regarding whether to compel arbitration must wait until I decide at trial whether Plaintiff actually signed the Client Agreement, because the arbitration clause also contains the class action waiver, I find that now is the appropriate time to determine whether Capital One can also rely on the arbitration clause. The Supreme Court has held that state law governs the right of a non-signatory to rely on an arbitration agreement. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009). The applicable provision in the Client Agreement states that "[a]ll questions concerning the agreement between [Plaintiff] and InCharge will be governed by the laws of the State of Florida without reference to any conflict of law rules." Whether a non-signatory can rely on the class action waiver is clearly a question concerning that agreement, so the Client Agreement's choice of law provision applies. As a result, I must apply Florida law in determining whether Capital One can rely on the arbitration clause.

Capital One argues that it can rely on the arbitration clause under the doctrine of equitable estoppel. Under Florida law:

> [e]quitable estoppel is warranted under two circumstances: (1) when the signatory to a contract containing an arbitration clause must rely on the terms of the contract in asserting its claims against the non-signatory; and (2) when the signatory to a contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract.

*Talk Fusion, Inc. v. Ulrich*, No. 8:11-cv-1134, 2011 WL 4102215, at *4 (M.D. Fla. Aug. 30, 2011); *see also Bahena v. American Voyager Indem. Ins. Co.*, No. 8:07-cv-1057, 2008 WL 780748, at *2 (M.D. Fla. Mar. 19, 2008). Plaintiff argues that under *In re Humana, Inc. Managed Care Litig.*, 285 F.3d 971 (11th Cir. 2002), *rev'd on other grounds sub nom. PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401 (2003), equitable estoppel can only apply if her claims rely on the underlying contract containing the arbitration clause. According to

Plaintiff, allegations of substantially interdependent and concerted misconduct do not constitute a sufficient basis to apply equitable estoppel.  This argument ignores numerous Florida cases post-dating *In re Humana* that continue to state that interdependent and concerted misconduct can permit a non-signatory to rely on the equitable estoppel doctrine.  *See, e.g.*, *Roman v. Atl. Coast Constr. and Dev., Inc.*, 44 So.3d 222, 224 (Fla. Dist. Ct. App. 2010); *Kolsky v. Jackson Square, LLC*, 28 So.3d 965, 969 (Fla. Dist. Ct. App. 2010); *Armas v. Prudential Sec., Inc.*, 842 So.2d 210, 212 9 (Fla. Dist. Ct. App. 2003).  Thus, it appears that Florida law continues to recognize that equitable estoppel applies when a party alleges interdependent and concerted misconduct by a non-signatory and a signatory.

Plaintiff has certainly alleged interdependent and concerted misconduct in this case.  The Complaint alleges, among other things, that Capital One knew that InCharge was not operating as a legitimate non-profit, that it "exercised control" over InCharge, and that it did business with InCharge "precisely because the misrepresentations InCharge was practicing on consumers directly benefited Capital One."  Plaintiff's allegations that Capital One and InCharge worked together to mislead and take advantage of consumers, if true, clearly constitute interdependent and concerted misconduct, and such allegations would allow Capital One to rely on the arbitration agreement.

Even if equitable estoppel requires that Plaintiff rely on the underlying contract in making out her claims against Capital One, I find that Capital One would be entitled to rely on the arbitration clause.  Plaintiff argues that because her claim against Capital One is based on a federal statute, it does not rely on the underlying contract for credit repair services.  But Plaintiff would not have any claims in the absence of some type of agreement.  Her sole claim against Capital One is that Capital One "engaged in practices, and/or courses of business that constituted

or resulted in the commission of, or attempts to commit, by InCharge, frauds or deceptions against consumers in connection with the offer or sale of the services of credit repair organizations in violation of 15 U.S.C. § 1679b(a)(4)."  The services offered or sold are those outlined in the DMP agreed to between Plaintiff and InCharge, and without the DMP, she would have no claims under the statute.  In effect, she is trying to "have it both ways" by relying on the DMP to establish her statutory claims while simultaneously disclaiming the agreement in order to avoid arbitration.  I find that under either prong of Florida equitable estoppel, Capital One can rely on the arbitration clause containing the class action waiver.

### B.  The Class Action Allegations

If, contrary to the assumption underlying the discussion above, Defendants cannot prove that Plaintiff entered into the Client Agreement containing the arbitration clause and class action waiver, Plaintiff will be able to pursue her claims in this Court.  In order to pursue her claims as the representative of a class, however, Plaintiff must still demonstrate that a class action would be permissible and appropriate under Federal Rule of Civil Procedure 23.  Given the unusual circumstances surrounding the formation and execution of Plaintiff's DMP, I find that Plaintiff would not be able to satisfy Rule 23's requirements.  Accordingly, even if Plaintiff did not sign the Client Agreement, I must still strike her class allegations.

Rule 23(c)(1)(A) provides that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action."  Although Plaintiff has not yet moved to certify a class, such motion is not required for a court to decide the certification issue when doing so is practicable and appropriate. *See* 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1785 (3d ed. 2005) ("[T]he court has an independent obligation to decide whether

an action brought on a class basis is to be so maintained even if neither of the parties moves for a ruling under subdivision (c)(1).”); *see also Pettit v. Gingerich*, 427 F. Supp. 282, 284 (D. Md. 1977); *Boring v. Medusa Portland Cement Co.*, 63 F.R.D. 78, 80 (M.D. Pa. 1974) (stating that a “court may act sua sponte or the defendant may move to have the court rule the action unmaintainable as a class action”).  InCharge has moved to strike Plaintiff’s class allegations, and having considered the factual and legal issues relating to class certification, I find it appropriate and practicable to address the certification issue at this time.

Rule 23(a) sets forth four “prerequisites” that any class action suit must satisfy.  The rule permits a suit by one or more members of a class as representative parties on behalf of other members of that class only if:

> (1) The class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

If Plaintiff can satisfy these prerequisites, she must also demonstrate that her action fits into one of three types described in Rule 23(b).  Rule 23(b)(1) permits class actions when:

> prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Rule 23(b)(2) permits a class action when “the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.”  And finally, Rule 23(b)(3) permits a class when “the questions of law or fact common to class members predominate over

any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Assuming, as I must, that Plaintiff entered into a DMP with InCharge in the manner pleaded in her complaint, she cannot meet Rule 23's requirements. Plaintiff seeks to represent two classes and a sub-class. The Capital One Class would consist of all consumers who were indebted to Capital One and who contracted for debt management plan services from InCharge Debt Solutions. The InCharge Class would consist of all consumers who entered into DMPs with InCharge, and there would be a sub-class of all Georgia residents who paid to InCharge fees or contributions that were not disbursed to creditors within 30 days of receipt by InCharge. Leaving aside the issue of how Plaintiff could have "contracted for debt management plan services" without signing any agreement either on paper or electronically, the question remains whom Plaintiff could actually represent if she were to move forward on a class basis. If Plaintiff did not sign the Client Agreement containing the arbitration clause, surely she cannot represent anyone who did sign it, either on paper or electronically. Such individuals would be bound by the express terms of their agreements with InCharge to arbitrate their claims. Plaintiff could not fairly and adequately represent in this Court the interests of individuals who are bound to pursue their claims in arbitration. More fundamentally, allowing Plaintiff to represent individuals bound to pursue their claims in arbitration would render the arbitration clauses totally useless, in contravention of the FAA.

That leaves the possibility that Plaintiff could represent the class of individuals who entered into and paid for DMPs but who, like Plaintiff, did not sign the Client Agreement containing the arbitration clause. While I found that InCharge has not presented evidence sufficient to grant a motion to dismiss Plaintiff's individual case, in light of the evidence

InCharge has presented about its standard procedures for signing up clients, I find it exceedingly implausible that there are very many, if any, other individuals who entered into DMPs without either signing either a paper or an electronic copy of the Client Agreement containing the arbitration clause.  There are almost certainly not enough to satisfy Rule 23(a)(1)'s numerosity requirement.

Even if there were enough such individuals that joinder would be impracticable, there would be too many factual variations in the cases for a class action to be appropriate.  For each class member, the factfinder would have to decide whether the facts in that individual's case show that he or she did not sign the Client Agreement and therefore is not bound by the arbitration clause.  Further, as Plaintiff herself acknowledges, class members' damages would vary depending on such factors as their overall debt, how long they were on their DMP, and how many accounts were entrusted to InCharge for servicing.  Plaintiff glances over this problem, asserting that damages could simply be calculated under a single formula—the amount of total fees paid to InCharge.  But such a formula ignores the language of the statute, which provides that the amount of actual damages awarded be the "greater of" any amount paid to the credit repair organization or the amount of actual damage sustained.  15 U.S.C. 1679g(a)(1).  Plaintiff's proposal would render the "greater of" language ineffective: under Plaintiff's formula, an individual who could prove actual damages greater than the amount of fees paid to InCharge would not receive the compensation to which he or she is entitled under the statute.  In sum, in the unlikely event that there are enough people in Plaintiff's position to satisfy the numerosity requirement, the factual differences between each person's case render the class action procedure inappropriate.  Because I find that Plaintiff cannot meet Rule 23's requirements for certifying a class action, I must strike her class allegations.

## IV. CONCLUSION

The foregoing analysis shows that regardless of whether Plaintiff signed the Client Agreement with InCharge or not, she cannot proceed in this Court on a class basis.  If she did sign the Agreement, the class action waiver contained in the arbitration clause precludes her from participating in any class action.  If she did not sign the Agreement, her unique situation renders her unable to satisfy Federal Rule of Civil Procedure 23's prerequisites for bringing a class action.  Accordingly, I will grant InCharge's motion to strike the class allegations against InCharge from the Complaint.  An appropriate order accompanies this memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this 15th day of November, 2012.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE